**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

WILLA ELMER                                    )        CASE NO. 1:18CV00308
  *on behalf of Victoria Elmer*,               )
                                               )
          Plaintiff,                           )
                                               )        MAGISTRATE JUDGE
       v.                                      )        JONATHAN D. GREENBERG
                                               )
NANCY A. BERRYHILL,                            )
          Acting Commissioner                  )        **MEMORANDUM OF OPINION**
          of Social Security,                  )        **AND ORDER**
                                               )
          Defendant.                           )

Willa Elmer, on behalf her deceased daughter Victoria Elmer, challenges the final

decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security

("Commissioner"), denying applications for a Period of Disability ("POD") and Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423,

and 1381 *et seq.* ("Act"). This Court has jurisdiction[2] pursuant to 42 U.S.C. § 405(g) and the

consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). Currently pending is Plaintiff's Motion

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government. *See* General Order 2018-15. The stay
was thereafter extended pursuant to General Order 2019-1. As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

1

to Substitute Party.  (Doc. No. 18.)  For the reasons set forth below, Plaintiff's Motion is

GRANTED and the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In April 2015, Victoria Elmer (hereinafter "Elmer") filed an application for POD, DIB,

and SSI[3] alleging a disability onset date of March 24, 2013[4] and claiming she was disabled due a

knee injury status post surgery, carpel tunnel in the left hand, and rotator cuff issues in the left

shoulder.  (Transcript ("Tr.") at 268, 275, 302.)  The applications were denied initially and upon

reconsideration, and Elmer requested a hearing before an administrative law judge ("ALJ").  (Tr.

205, 214, 219.)

On January 24, 2017, an ALJ held a hearing, during which Elmer, represented by

counsel, and an impartial vocational expert ("VE") testified.  (Tr. 55.)  On May 12, 2017, the

ALJ issued a written decision finding Elmer was not disabled.  (Tr. 24-43.)  The ALJ's decision

became final on December 29, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On December 30, 2017, Elmer passed away.  (Doc. No. 18-1 at 1.)  On February 8, 2018,

her mother, Willa Elmer (hereinafter "Plaintiff") filed a Complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.

(Doc. Nos. 13, 15.)  Plaintiff asserts the following assignment of error:

---

[3]      Plaintiff Willa Elmer concedes the only issue in this appeal is the denial of her
         daughter's applications of POD and DIB because she does not meet the statutory
         or regulatory requirements for pursuing an underpayment of SSI benefits.  (Doc.
         No. 18 at 1, Doc. No. 13 at 3.)  *See* 20 CFR §416.542(b)(4).

[4]      Elmer later amended her onset date to January 20, 2015.  (Tr. 27.)

(1)     Whether the ALJ's assessment of Ms. Elmer's residual functional capacity
        is supported by substantial evidence, including treating physician
        evidence.

(Doc. No. 13 at 1.)

## II.  MOTION TO SUBSTITUTE PARTY

As noted *supra*, Victoria Elmer died on December 30, 2017, prior to the commencement

of this action.  (Doc. No. 18-1 at 1.)  Within the Complaint and the Brief on the Merits, Plaintiff

did not provide any documentation of Victoria Elmer's death or any additional evidence (i.e.

proof of no surviving spouse or children) to certify she had standing to pursue the collection of

her deceased daughter's benefits.  (*See* Doc. No. 1, 13.)  Due to concerns over its jurisdiction,

the Court directed Plaintiff to file supplemental briefing to establish she had standing to pursue

this action.  (Doc. No. 17.)  Plaintiff thereafter filed a Motion to Substitute Party on December

17, 2018.  (Doc. No. 18.)  The Commissioner has not filed any objection or response.  For the

reasons set forth below, the Court finds Plaintiff has established she has standing to pursue this

matter.

If a claimant dies prior to receiving an underpayment of Title II benefits, certain other

individuals may receive the underpayment under social security regulations.  *Blanton ex rel.*

*Blanton v. Astrue*, 2011 WL 2637224, at *2 (N.D. Ohio June 20, 2011), *report and*

*recommendation adopted*, 2011 WL 2637248 (N.D. Ohio July 6, 2011) (citing 20 C.F.R. §

404.503(b); 42 U.S.C. § 404(d)).  A deceased claimant's Title II benefits may be paid, in order of

priority, as follows:

(1) The deceased individual's surviving spouse as defined in section 216(c),
(g), or (h) of the Act who was either:

(i) Living in the same household (as defined in § 404.347) with the deceased individual at the time of such individual's death, or

(ii) Entitled to a monthly benefit on the basis of the same earnings record as was the deceased individual for the month in which such individual died.

(2) The child or children of the deceased individual (as defined in section 216(e) or (h) of the Act) entitled to a monthly benefit on the basis of the same earnings record as was the deceased individual for the month in which such individual died (if more than one such child, in equal shares to each such child).

(3) The parent or parents of the deceased individual, entitled to a monthly benefit on the basis of the same earnings record as was the deceased individual for the month in which such individual died (if more than one such parent, in equal shares to each such parent). For this purpose, the definition of "parent" in § 404.374 includes the parent(s) of any deceased individual who was entitled to benefits under title II of the Act.

(4) The surviving spouse of the deceased individual (as defined in section 216(c), (g), or (h) of the Act) who does not qualify under paragraph (b)(1) of this section.

(5) The child or children of the deceased individual (as defined in section 216(e) or (h) of the Act) who do not qualify under paragraph (b)(2) of this section (if more than one such child, in equal shares to each such child).

(6) The parent or parents of the deceased individual, who do not qualify under paragraph (b)(3) of this section (if more than one such parent, in equal shares to each such parent). For this purpose, the definition of "parent" in § 404.374 includes the parent(s) of any deceased individual who was entitled to benefits under title II of the Act.

(7) The legal representative of the estate of the deceased individual as defined in paragraph (d) of this section.

20 CFR §404.503(b); *see also* 42 USC §404(d).

However, an individual listed under this section may only receive such benefits if there are no preceding eligible individuals in the order of priority. *Blanton*, 2011 WL 2637224 at *2.

*See also Brown v. Berryhill*, 2017 WL 5493362, *1 (E.D. Mich. Sept. 8, 2017), *report and*

*recommendation adopted by* 2017 WL 5898459 (E.D. Mich. Nov. 30, 2017). Thus, in order to establish standing to pursue a deceased claimant's benefits, a plaintiff must show "she is the person highest in priority to receive the claimant's possible DIB benefits." *Id*. at *2. Moreover, a court cannot infer standing based upon allegations in the pleadings. Rather, the basis of standing must "affirmatively appear in the record; and naked assertions devoid of further factual enhancement will not suffice." *Blanton*, 2011 WL 2637224 at *2 (citing *White v. United States*, 601 F.3d 545, 551-552 (6th Cir. 2010)).

Here, Plaintiff has established Victoria Elmer is deceased via death certificate. (Doc. 18-1 at 1.) She also has shown she is the deceased Elmer's mother and Elmer was not survived by a spouse or children. (Doc. No. 18-1 at 1; Tr. 268-269.) Based upon this evidence, the Court is satisfied Plaintiff meets the eligibility requirements to pursue Elmer's Title II benefits and there are no other higher ranking individuals under 20 CFR §404.503(b). Thus, Plaintiff has demonstrated she has standing to bring this suit and her unopposed Motion to Substitute Party is GRANTED.

## III.   EVIDENCE

### A.    Personal and Vocational Evidence

Elmer was born in November 1966 and was 51 years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security regulations. (Tr. 157.) *See* 20 C.F.R. §§ 404.1563(d). She has a high school education and is able to communicate in English. (Tr. 163.) She has past relevant work as an administrative clerk and an office manager. (Tr. 35.)

## B. Medical Evidence[5]

*Evidence Prior[6] to Date Last Insured*

On July 8, 2013, Elmer began a course of aquatic therapy for her right knee pain. (Tr. 410.) Following her first session, she had improved gait quality and pain levels. (Tr. 410, 411.) Elmer returned to physical therapy on July 10, 2013, reporting her left knee pain was intermittent and slightly improved since her last visit. (Tr. 413.) Elmer continued to experience pain in her left knee with weight bearing on July 16, 2013. (Tr. 416.) However, her gait quality had improved and her pain decreased by the end of her physical therapy session. (Tr. 417.)

Elmer's last visit of aquatic therapy was on July 18, 2013. (Tr. 419.) Her gait quality and pain intensity were again noted to be improved. (Tr. 419, 420.) She was discharged from physical therapy on August 19, 2013, as she had achieved her strength goals. (Tr. 422.) However, Elmer continued to struggle with high levels of pain. (*Id.*)

On November 5, 2013, Elmer visited primary care physician Nathan D. Tracey, DO, regarding her blood pressure and left knee pain. (Tr. 430.) Her blood pressure was controlled and she denied any chest pain or shortness of breath. (*Id.*) She indicated she had recently lost 14 pounds, but struggled to exercise due to knee pain. (*Id.*) Elmer reported her knee pain had been present since March 2013 and intensified with weight bearing. (*Id.*) On examination, her left knee range of motion was normal, with no swelling or tenderness, and normal muscle tone. (Tr.

---

[5]     The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[6]     Elmer's date last insured ("DLI") was on December 31, 2015. (Tr. 29.) Therefore, in order to be entitled to POD and DIB, Elmer must establish a continuous twelve month period of disability prior to this date. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

431.)  Dr. Tracey advised Elmer to continue her home exercises and prescribed Meloxicam.  (Tr. 432.)

A January 3, 2014 left knee MRI revealed (1) fraying or a possible small tear along the inner margin of the lateral meniscal body; (2) patellofemoral osteoarthritis with a chondral flap of the lateral facet; (3) mild osteoarthritic changes of the femoratibial compartment; (4) no joint effusion or synovitis; and (5) an intact ACL and MCL.  (Tr. 449.)

Elmer visited primary care doctor Thomas Schalcosky, DO, on January 30, 2014, for continued left knee pain.  (Tr. 447.)  She indicated she has been wearing a knee brace on an as-needed basis and her medications were helpful.  (*Id*.)  On examination, Elmer's spinal range of motion was normal and her muscular strength was intact.  (Tr. 450.)  She had no joint swelling, deformity, or tenderness.  (*Id*.)  Dr. Schalcosky reviewed Elmer's MRI and referred her to an orthopedist for a left lateral meniscus tear.  (Tr. 449, 450.)

Elmer subsequently received a cortisone injection in her knee on April 9, 2014.  (Tr. 458.)  She followed up with Dr. Tracey on May 8, 2014, reporting the injection provided no relief and her pain had worsened since the injection.  (*Id.*)  On examination, Elmer had no swelling or effusion, but there was tenderness in her left knee.  (Tr. 459.)  Dr. Tracey advised Elmer to visit an orthopedist and pain management doctor.  (Tr. 460.)

On July 15, 2014, Elmer underwent a left knee arthroscopic partial lateral meniscectomy with orthopedist James S. Williams, MD.  (Tr. 571.)  Following this operation, Elmer attended physical therapy.  (Tr. 564.)  On July 23, 2014, Elmer had constant pain in her knee and deficits in range of motion, strength, ambulation, and functional mobility.  (Tr. 564, 566.)  She was

ambulating with crutches and her left knee was stiff.  (Tr. 565.)  Due to swelling, an ultrasound was ordered to rule out deep vein thrombosis.  (Tr. 695, 468.)

Elmer returned to Dr. Tracey on September 19, 2014, reporting she was "doing well" in physical therapy.  (Tr. 468.)  On examination, she had trace edema in her right leg.  (*Id.*)  Elmer indicated she had a crutch with her "just in case" but had not been using it regularly.  (*Id.*)

Elmer saw Dr. Tracey on December 5, 2014 for fatigue and left shoulder pain.  (Tr. 474.)  On examination, her gait was normal.  (Tr. 476.)  She had tenderness and decreased strength in the left shoulder, but a normal range of motion.  (*Id.*)  Dr. Tracey ordered blood work and a sleep study for her fatigue and advised Elmer to visit an orthopedist for her shoulder.  (Tr. 475, 476.)  A December 10, 2014 left knee x-ray confirmed mild knee osteoarthritis and osteopenia.  (Tr. 692.)

On December 10, 2014, Alan Duignan, PA-C, a physicians' assistant in Dr. Williams' office, provided the following statement:

> Victoria Elmer was seen in my clinic on December 10, 2014 and had surgery in July of 2014.  She is still struggling with pain and swelling related to the surgery making work and other activities difficult until more improvement is noted with the knee.

(Tr. 749.)

On January 9, 2015, Elmer visited primary care physician Lacey Neugebauer, DO.  (Tr. 482.)  She indicated her fatigue had "greatly improved" after starting an iron supplement.  (*Id.*)  Elmer also reported undergoing multiple injections in her left knee, which she did not find helpful.  (*Id.*)  On examination, she was wearing a knee brace and her gait was normal.  (Tr. 482, 485.)

Elmer resumed physical therapy in January 2015. On January 22, 2015, her shoulder was feeling better overall, but her knee continued to bother her with standing and walking. (Tr. 511.) On February 6, 2015, Elmer indicated her shoulder was improving and rated her knee pain as 2/10 and intermittent in nature. (Tr. 508.) On examination, she had a mildly antalgic gait. (*Id*.) On February 20, 2015, Elmer reported "a lot of improvements" in her left shoulder, with some residual numbness and tingling in her hands. (Tr. 504.) She indicated she had "good and bad days" in her left knee and a few instances where she had slipped on ice. (*Id*.) Elmer relayed her knee pain was worse with weight bearing and she could not walk any distance without intense pain. (*Id*.) She indicated she was using a motorized cart at the grocery store and took breaks when washing dishes. (*Id*.) On examination, she had minimal edema throughout her knee and full strength in her hips and knees. (*Id.*)

On March 5, 2015, Elmer was "feeling better" with no pain in her left shoulder, but had ongoing pain in her left knee. (Tr. 499.) Her physical therapist noted that while Elmer's shoulder had "significantly improved," her left knee pain continued to limit her. (Tr. 500.)

Elmer visited Alan Duigan, PA-C on March 10, 2015, reporting extreme pain in her left knee with extended walking and kneeling. (Tr. 497, 498.) On examination, she had crepitus and pain with flexion. (Tr. 498.) Mr. Duigan administered a cortisone injection. (*Id.*)

Elmer returned to physical therapy on March 19, 2015. She indicated her knee pain had improved after her recent injection, but returned after she had slipped. (Tr. 493.) She reported the pain after slipping was so "intense she almost fainted," but had been gradually improving. (*Id*.) On examination, she had minimal edema throughout the knee and full strength in her hips, knees, and ankles. (Tr. 494.) Elmer had no appreciable antalgia in her gait and full range of

motion and strength in her left shoulder.  (Tr. 495, 496.)  She also had full range of motion and strength in her knee.  (Tr. 496.)  At that time, her physical therapist provided Elmer with a home exercise program and discharged her from therapy, as she had met her therapy goals.  (*Id.*)

On April 14, 2015, Elmer visited Mr. Duigan, reporting she was doing "fairly well," but had some increased pain and swelling after a cortisone injection.  (Tr. 492.)  On examination, she had tenderness in her knee, but no effusion.  (Tr. 493.)  Mr. Duigan concluded Elmer strained her patellar tendon and advised her to rest and ice until it improved.  (*Id.*)  He also ordered Elmer prescription orthopedic shoes.  (Tr. 812.)

Elmer followed up with Dr. Williams on June 17, 2015.  Dr. Williams noted Elmer had undergone a Supartz injection in May, but it provided no relief.  (Tr. 794.)  On examination, Elmer had discomfort with palpation along her knee.  (*Id.*)  Dr. Williams concluded Elmer had either lost more cartilage or had a stress fracture.  (*Id.*)  He advised her to wear her knee brace as much as possible and ordered an updated MRI.  (*Id.*)  The MRI revealed mild osteoarthritic changes and blunting of the margin of the body and posterior horn of the lateral meniscus.  (Tr. 822.)

Elmer visited physical therapy on June 24, 2015, reporting she was still struggling with knee pain.  (Tr. 902.)  On examination, she had slightly decreased hip strength, but full knee strength and normal sensation.  (Tr. 903.)  Her gait was slow and she did not use any assistive device for ambulation.  (*Id.*)

On July 2, 2015, Elmer visited pain management physician Samuel Samuel, MD, reporting left arm and left knee pain.  (Tr. 983.)  She denied a gait disturbance or any frank weakness in her left arm.  (*Id.*)  On examination, Elmer displayed good motor power in her hand

grip, tenderness over her lower lumbar spine, and minimal tenderness over the sacroiliac joint. (Tr. 984.)  Dr. Samuel prescribed Topamax and ordered an EMG and MRI.  (*Id*.)

A July 21, 2015, MRI of the lumbar spine revealed mild degenerative changes in the facet joints of the lower lumbar spine without any significant canal or foraminal stenosis.  (Tr. 826.)  An EMG of the upper extremities revealed mild median mononeuropathy (e.g., bilateral carpal tunnel syndrome), which was worse on the left side.  (Tr. 829.)  It was negative for cervical radiculopathy, brachial plexopathy, or other types of neuropathy.  (*Id*.)

Elmer underwent a "well woman" examination with gynecologist Habibeh Gitiforooz, MD, on July 27, 2015.  (Tr. 901.)  She had no joint swelling, pain, or stiffness on examination. (*Id.*)  Dr. Gitiforooz obtained a pap smear and ordered a mammogram.  (Tr. 902.)

On July 29, 2015, Elmer visited physicians' assistant Dalbir Singh, PA, at her pain management doctor's office.  (Tr. 899.)  She reported lower back pain, but denied any radicular symptoms.  (*Id*.)  On examination, Elmer's bilateral upper and lower extremity strength was normal and symmetric.  (Tr. 900.)  Her straight leg raises were negative.  (*Id*.)  She had pain with palpation in her lumbar paraspinal muscles and her gait was antalgic.  (*Id*.)  Dalbir Singh recommended Elmer wear a left wrist brace and continue her home exercise program.  (*Id*.)

Elmer returned to Dr. Williams on August 26, 2015.  Dr. Williams observed Elmer's back pain was hindering her ability to make a full recovery with her knee.  (Tr. 803.)  He noted she had some upcoming treatment for her back and advised her to resume physical therapy once her back pain improved.  (*Id*.)

On August 28, 2015, Elmer visited Dr. Neugebauer, reporting increased fatigue.  (Tr. 890.)  As the etiology of her fatigue was unclear, Dr. Neugebauer ordered bloodwork.  (Tr. 892.)

11

At the time, Elmer requested a shower chair and raised toilet seat. (Tr. 893.) These were provided to Elmer several weeks later. (Tr. 970.)

Elmer followed up with Dr. Samuel on September 3, 2015 for back, left knee, and left hand pain. (Tr. 1027.) She reported undergoing several injections and gel shots into her knee, which provided no relief. (*Id*.) On examination, Elmer was wearing a left knee brace and her gait was antalgic. (Tr. 1028.) Her straight leg raises were negative and her sensation was normal. (*Id*.) She had pain with palpation over her lumbar paraspinal muscles. (*Id*.) Dr. Samuel advised her to continue with physical therapy and wean off of Topamax. (*Id*.) That same date, Dr. Samuel prescribed a disability placard with the following restriction: "cannot walk 200 [feet] without stopping at rest." (Tr. 806.)

Elmer attended physical therapy on September 3, 2015. She reported the exercises bothered her back, but her knee brace fit well and was somewhat helpful. (Tr. 888.) The physical therapist, Matthew Winters, PT, noted Elmer's range of motion and strength had improved, but her progress was slow due to back pain. (Tr. 889.) During a September 10, 2015 physical therapy visit, Elmer reported increased pain, rating it as 8/10. (Tr. 885.) She had an antalgic gait and her knee pain increased with full extension. (Tr. 885, 886.) However, Elmer also demonstrated increased independence with her exercises and improved range of motion and strength. (Tr. 886.)

On September 23, 2015, Dr. Neugebauer provided the following statement:

This letter is in regards to the above named patient, Victoria Elmer, Case #5114177982. Ms. Elmer has a known history of chronic pain secondary to degenerative changes in her spine and knees as well as carpal tunnel syndrome for which she follows with pain management and orthopedics. Ms. Elmer has requested that I disclose these diagnoses to you for

clarification as to why she requires assistance and cannot perform full duty work at this time.

(Tr. 1075.)

On October 7, 2015, Elmer received two wrist splints.  (Tr. 963.)  On November 30, 2015, Elmer visited orthopedist Steven Maschke, MD, for bilateral hand numbness and tingling.  (Tr. 1045.)  She indicated these symptoms had been present for the past six months and she was using night splints.  (*Id.*)  On examination, Elmer had a full range of motion in her cervical spine, shoulders, and elbows.  (Tr. 1046.)  She had no atrophy in her hands, but she did have diminished sensation in several of her fingers.  (*Id.*)  Dr. Maschke diagnosed bilateral carpal tunnel syndrome and injected Elmer's left hand.  (*Id.*)

Elmer followed up with Dr. Neugebauer on December 15, 2015, reporting her energy level had improved slightly.  (Tr. 1052.)  She indicated no relief from her left hand injection and continued left knee pain.  (*Id.*)  On examination, Elmer's wrists had a normal range of motion with no tenderness.  (Tr. 1055.)  Her left knee was tender, but with a normal range of motion, no swelling, and normal patellar mobility.  (*Id.*)

*Post-Date Last Insured Evidence*

On January 11, 2016,[7] Elmer returned to Dr. Maschke, indicating her left hand injection had caused excessive swelling.  (Tr. 1156.)  She continued to experience numbness, tingling, and pain in her palm.  (*Id.*)  Dr. Maschke recommended Elmer enter a wellness program, in order to begin an anti-inflammatory diet and weight loss program.  (Tr. 1157.)

---

[7]     While the proceeding treatment notes all occurred following the DLI, the Court will include them in its recitation of the evidence as the parties cited to them in their briefs.  (*See* Docs. No. 13, 15.)

Elmer attended physical therapy in February 2016.  On February 16, 2016, Elmer was "feeling pretty good" and rated her pain as 2/10.  (Tr. 1117.)  On February 26, 2016, Elmer had "improved overall" and was "much happier with her movement and ability to ambulate."  (Tr. 1129.)  She was discharged from physical therapy at that time as she had "improved lumbar motion, decreased pain, and better awareness of the lumbar stabilization, posture, and body mechanics."  (Tr. 1130.)

On March 15, 2016, Elmer visited Dr. Samuel, reporting improved pain levels.  (Tr. 1193.)  Her straight leg raise was negative and she had no pain to palpation over her spine.  (Tr. 1197.)  She had a normal spinal range of motion, her peripheral joint range of motion was full and pain free, and her gait was normal.  (*Id.*)  Her upper and lower extremity strength was normal and symmetric.  (*Id.*)

Elmer followed up with Dr. Williams on March 18, 2016.  (Tr. 1204.)  She reported her back was "a lot better," but her knee was still bothering her.  (*Id.*)  Dr. Williams found no evidence of a new knee injury, but noted she had "some arthritis" and recommended additional physical therapy.  (*Id.*)  He also advised Elmer to wear her knee brace.  (*Id.*)

On March 24, 2016, Elmer visited Dr. Neugebauer and requested "disability for her orthopedic concerns."  (Tr. 1208.)  She reported that while her back pain had improved, she was still unable to stand or walk for long periods.  (Tr. 1209.)  On examination, Elmer had tenderness in both of her wrists, but a normal range of motion.  (Tr. 1211.)  Her hand strength was normal but she displayed positive Tinel's and Phalen's signs bilaterally.  (Tr. 1212.)  Dr. Neugebauer ordered a physical performance test "due to request for disability."  (*Id.*)

Elmer returned to Dr. Maschke on March 28, 2016 for her bilateral hand numbness and tingling. (Tr. 1335.) She characterized her symptoms as "mild on the left and more severe on the right." (*Id.*) On examination, Elmer had mildly positive Tinel's signs bilaterally, but no tenderness in the forearm and no thenar atrophy. (Tr. 1336.) Elmer indicated to Dr. Maschke she felt her symptoms were "part of a bigger systemic issue as she has vague symptoms throughout her entire body." (*Id.*) She elected to continue "down the holistic wellness route" and agreed to discuss surgical options if her symptoms persisted. (*Id.*)

On April 19, 2016, Elmer visited occupational therapist Anne Baldwin, OT, for her hand symptoms. (Tr. 1558.) She reported she could not cut food and avoided picking up items with her right hand. (*Id.*) On examination, Elmer was able to make a complete fist, albeit with pain on the right side. (Tr. 1559.) She was able to fully extend her fingers. (*Id.*) Her grip strength was 46 pounds on the right and 52 pounds on the left. (*Id.*) Ms. Baldwin provided Elmer with bilateral wrist braces and exercises. (Tr. 1560.) Elmer did not require any further occupational therapy. (*Id.*)

Elmer underwent a functional capacity evaluation on April 26, 2016 with occupational therapist Lidiya Kanarsky, OTR/L. (Tr. 1371.) Based upon the evaluation, Ms. Kanarsky concluded Elmer could "perform within the LIGHT Physical Demand Capacity," with occasional lifting of 15 pounds, occasionally carrying of 20 pounds, frequent walking, constant reaching, constant above shoulder reaching, frequent fine motor coordination, occasional gross motor coordination, occasional pinching, avoid firm grasping, frequent bending and squatting, and no sustained squatting and kneeling. (Tr. 1372-1373.)

On May 10, 2016, Elmer resumed physical therapy for her left knee. (Tr. 1496.) On examination, she had a decreased range of motion in both knees and her left knee strength was slightly decreased on examination. (*Id*.) On June 2, 2016, Elmer reported she was "doing well," but a recent move had caused a slight increase in pain. (Tr. 1506.) On examination, Elmer displayed increased strength. (Tr. 1507.) On June 7, 2016, her pain had subsided and she was doing well. (Tr. 1509.)

On June 23, 2016, Elmer reported visiting the beach a few days prior, which exacerbated her knee pain. (Tr. 1513.) She was wearing a knee brace and rated her pain as 8/10. (*Id*.) Her physical therapist, Matthew Winters, PT, noted while Elmer experienced "significant knee pain during weight bearing activities [her] pain rarely limit[ed] participation in exercises." (Tr. 1514.)

Elmer visited orthopedist Mark Hendrickson, MD, on June 27, 2016 for her carpal tunnel syndrome. (Tr. 1518.) Dr. Hendrickson noted Elmer's EMG had confirmed mild carpal tunnel syndrome. (*Id*.) On examination, she had slight weakness, "very slight right median intrinsic atrophy," and bilateral Tinel's signs. (*Id*.) Elmer had good intrinsic and extrinsic muscle and tendon function. (*Id*.) Following this office visit, Elmer elected to undergo carpal tunnel release surgery. (Tr. 1535.)

A July 12, 2016 MRI of the left knee revealed (1) a degenerative tear in the body of the lateral meniscus and (2) lateral and patellofemoral compartment osteoarthritis with areas of full thickness chondral loss in the lateral compartment. (Tr. 1285.)

Elmer consulted with rheumatologist Carmen E. Gota, MD, on August 26, 2016. (Tr. 1535.) On examination, Elmer's joints were not swollen, but she had a positive Tinel's sign on the right. (Tr. 1538.) Dr. Gota prescribed Gabapentin and ordered labwork. (*Id*.)

On September 2, 2016, Dr. Hendrickson provided the following statement:

> This is to certify that Victoria Elmer is under my care for bilateral carpal tunnel syndrome. She has slight right median intrinsic atrophy and slight weakness. She has [T]inel's on both sides, positive median compression on both sides and decreased light touch more right than left.
>
> My medical recommendation is to undergo bilateral carpel tunnel release surgery. Unfortunately due to other medical conditions she will need to hold off on our surgery and proceed with a left knee surgery.
>
> At the present time my patient Ms. Elmer is unable to work due to the severity of her carpal tunnel syndrome.

(Tr. 1300.)

On September 19, 2016, Dr. Williams performed a left knee arthroscopy to repair Elmer's left knee lateral meniscus tear. (Tr. 1583.) Elmer began left knee rehabilitation therapy on October 11, 2016. (Tr. 1256.) At that time, she was ambulating with bilateral crutches and had a limited range of motion in her left knee. (Tr. 1256, 1257.) The evaluating physical therapist, Ioanna Simon, PT, determined Elmer had "typical post op pain and swelling" with a good prognosis. (Tr. 1257.) Elmer did have a significant loss of range of motion, which Ms. Simon attributed to "how she holds her knee at rest." (*Id*.)

Elmer returned to Dr. Gota on December 1, 2016. (Tr. 1602.) Dr. Gota discontinued Elmer's Gabapentin and Naproxen and prescribed Tramadol. (Tr. 1606.)

On December 14, 2016, Elmer followed up with Dr. Williams. (Tr. 1592.) She reported continued pain and swelling, which was interfering with her progress in physical therapy. (*Id*.) Dr. Williams administered a steroid injection in an attempt to decrease the swelling. (*Id*.)

**C.      State Agency Reports**

On July 3, 2015, state agency physician William Bolz, M.D., reviewed Elmer's medical records and completed a Physical RFC assessment. (Tr. 161-162.) Dr. Bolz determined Elmer could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and/or walk for more than 6 hours in an 8-hour workday; and sit for more than 6 hours in an 8-hour workday. (*Id*.) He further found Elmer had an unlimited capacity to climb ramps, stairs, ladders, ropes, and scaffolds. (Tr. 162.) Dr. Bolz determined Elmer could frequently stoop, kneel, crouch, and crawl. (*Id*.)

On October 25, 2015, state agency physician Leon D. Hughes, M.D., reviewed Elmer's medical records and completed a Physical RFC assessment. (Tr. 185-186.) Dr. Hughes determined Elmer could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and/or walk for 4 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 185.) He further found Elmer could frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, and occasionally stoop, kneel, crouch, and crawl. (Tr. 186.) Dr. Bolz determined Elmer had an unlimited capacity to balance. (*Id*.)

**D.      Hearing Testimony**

During the January 24, 2017 hearing, Elmer testified to the following:

- She lives with her sister in her sister's home. (Tr. 63.) Prior to that, she lived with her mother. (Tr. 64.) She has been using a shower chair since 2015. (Tr. 66.) She must sit in a chair while washing

dishes. (Tr. 74.) Her mother and her sister assist her with her laundry. (*Id.*) She is able to drive. (*Id.*)

- She used to enjoy crocheting and decorating cakes, but has not performed these activities since 2014. (Tr. 66.) She last worked as a staffing administrator for a military contractor. (Tr. 69.) Prior to that, she worked as an office manager for a government agency. (Tr. 72.)

- She has carpal tunnel syndrome in her right hand and four of her fingers are numb. (Tr. 76.) She has shooting pain which radiates from her hand to midway between her wrist and elbow. (Tr. 76-77.) She has a burning and tingling sensation in her left hand. (Tr. 77.) She has difficulty lifting objects, cutting food, and opening jars. (Tr. 84.)

- Her left knee is often swollen, which has caused her foot to "veer to the left." (Tr. 78.) She often loses her balance and uses a crutch. (Tr. 79.) She has undergone surgery, injections, and physical therapy for her left knee. (Tr. 79-80.) She also uses a knee brace. (Tr. 80.)

The VE testified Elmer had past work as an administrative clerk (D.O.T. #219.362-010) and office manager (D.O.T. #169.167-034). (Tr. 85-86.) The ALJ then posed the following hypothetical question:

First off, I would like you to consider a person with the same age, education, and past work as the Claimant, who is able to lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk 4 hours of an 8-hour workday, is able to sit for six hours of an 8-hour workday, would have unlimited push and pull, other than shown for lift and or carry, could occasionally climb ramps and stairs, could never climb ladders, ropes, or scaffolds, and could occasionally stoop, kneel, crouch, and crawl.

(Tr. 86.)

The VE testified the hypothetical individual would be able to perform Elmer's past work as an administrative clerk and an office manager. (Tr. 87.) The ALJ then added the additional

limitation of "frequent handling and fingering bilaterally." (*Id.*) The VE testified such an individual would still be able to perform Elmer's past work. (*Id.*)

## IV.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Elmer was insured on her alleged disability onset date, January 20, 2015 and remained insured through December 31, 2015, her date last insured ("DLI.") (Tr. 29.) Therefore, in order to be entitled to POD and DIB, Elmer must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## V. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since January 20, 2015, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: osteoarthritis(knees), lumbar spondylosis, bilateral carpal tunnel syndrome, and obesity (20 CFR 404.1520(c) and 416.920(c).

4. The claimant does not have any impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to stand and walk for four hours in an eight-hour workday. The claimant can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, and scaffolds. The claimant can perform frequent handling and fingering bilaterally.

6.  The claimant is capable of performing past relevant work as an administrative clerk and office manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from January 20, 2015, through the date of the decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 29-36.)

## VI. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at *2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are

22

supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston*

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial

evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.

2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of*

*Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

conclusion, the decision of the Administrative Law Judge must stand if the evidence could

reasonably support the conclusion reached.") This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d

at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VII.    ANALYSIS

In her sole assignment of error,[8] Plaintiff asserts the ALJ "erred in giving little weight to the treating physicians' opinions of Dr. Neugebauer and Dr. Hendrickson." (Doc. No. 13 at 9.) She contends the ALJ's basis for rejecting these opinions was "not legally sufficient, nor supported by the evidence of record." (*Id.*)  Plaintiff maintains "there is strong support, and consistency, between the medical opinions and the other medical evidence of record," thus supporting Drs. Neugebauer and Hendrickson's conclusion she could not work. (*Id*. at 11, 13.) She asserts "the ALJ erred in assessing the treating source opinions by failing to recognize the

---

[8]    The Court notes Plaintiff, in her assignment of error, summarily asserts "Elmer's residual functional capacity is not supported by substantial evidence." (Doc. No. 13 at 9.)  However, within her brief, Plaintiff only presents arguments regarding two treating physician opinions and does not advance a separate RFC argument. (*Id.* at 9-14.)  While the Commissioner argues the RFC is supported by substantial evidence, and provides a detailed argument as to why, she acknowledges Plaintiff's "only challenge of the ALJ's evaluation of the evidence" is regarding the treating source opinions. (Doc. No. 15 at 13, 18.)  Thus, the Court will not conduct a separate analysis of the RFC and will limit its discussion to the arguments set forth in Plaintiff's brief.

supportability and consistency of the treating physicians' opinions with the evidence of record."

(*Id*. at 13.)  Plaintiff argues the ALJ "committed further error by failing to continue with an

evaluation of the treating physicians' opinions" through the additional regulatory factors.  (*Id*. at

13.)  She maintains the consideration of these additional factors was crucial since Elmer received

all of her treatment "through Cleveland Clinic providers who worked in conjunction to treat her

multiple impairments."  (*Id*.)

     The Commissioner maintains "the ALJ properly discredited the doctors' conclusory and

unsupported opinions that [Victoria Elmer] could not work."  (Doc. No. 15 at 18.)  The

Commissioner asserts the ALJ disregarded these opinions not only "because it involves the

ultimate issue of disability," but also because  "they provided no functional limitations that could

be included in the RFC finding and, most importantly, they were inconsistent with the medical

evidence."  (*Id*. at 18, 19.)  The Commissioner contends the ALJ was not required to discuss

every regulatory factor in the opinion and properly "indicated the factors that he found relevant –

consistency and supportability."  (*Id*. at 20.)

     A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v.*

*Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[9]  However,

"a finding that a treating source medical opinion . . . is inconsistent with the other substantial

evidence in the case record means only that the opinion is not entitled to 'controlling weight,'

not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir.

---

[9] Revised versions of these regulations took effect on March 27, 2017 and apply to
disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[10] Indeed, "[t]reating

source medical opinions are still entitled to deference and must be weighed using all of the

factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[11] *See also*

*Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion

controlling weight, then the opinion is weighed based on the length, frequency, nature, and

extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the

degree to which the opinion is consistent with the record as a whole and is supported by relevant

evidence, *id*. § 404.1527(c)(2)-(6).")

 If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5). *See also Gayheart*,

710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear

explanation "'let[s] claimants understand the disposition of their cases,' particularly where a

claimant knows that his physician has deemed him disabled and therefore 'might be bewildered

---

[10] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after
March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1.

[11] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a
treating physician's opinion, the Commissioner should consider the length of the
relationship and frequency of examination, the nature and extent of the treatment
relationship, how well-supported the opinion is by medical signs and laboratory findings,
its consistency with the record as a whole, the treating source's specialization, the
source's familiarity with the Social Security program and understanding of its evidentiary
requirements, and the extent to which the source is familiar with other information in the
case record relevant to the decision.

when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of

disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As noted *supra*, two of Elmer's treating physicians provided statements regarding her ability to work.  On September 23, 2015, Dr. Neugebauer concluded the following:

> This letter is in regards to the above named patient, Victoria Elmer, Case #5114177982.  Ms. Elmer has a known history of chronic pain secondary to degenerative changes in her spine and knees as well as carpal tunnel syndrome for which she follows with pain management and orthopedics.  Ms. Elmer has requested that I disclose these diagnoses to you for clarification as to why she requires assistance and cannot perform full duty work at this time.

(Tr. 1075.)  On September 2, 2016, nearly a year after Elmer's DLI had expired, Dr. Hendrickson provided the following statement:

> This is to certify that Victoria Elmer is under my care for bilateral carpal tunnel syndrome.  She has slight right median intrinsic atrophy and slight weakness.  She has [T]inel's on both sides, positive median compression on both sides and decreased light touch more right than left.
>
> My medical recommendation is to undergo bilateral carpel tunnel release surgery.  Unfortunately due to other medical conditions she will need to hold off on our surgery and proceed with a left knee surgery.
>
> At the present time my patient Ms. Elmer is unable to work due to the severity of her carpal tunnel syndrome.

(Tr. 1300.)

The ALJ accorded these opinions "little weight," as follows:

> The undersigned has also considered the opinions of the claimant's treating physicians.  Her primary care physician, Lacey Nagerbauer, D.O., submitted a medical source statement dated September 23, 2015, indicating that due to chronic pain secondary to the claimant's degenerative disease; she would be unable to perform full work duty (Exhibit 14F).  Similarly, the claimant's treating orthopedic surgeon, Mark Hendrickson, M.D., noted on September 2, 2016, that the claimant was unable to work (Exhibit 22F/4).  While the undersigned noted that an opinion on whether an individual is disabled goes

to an issue reserved to the Commissioner and therefore cannot be given special significance, such opinion should still be considered in the assessment of the claimant's residual functional capacity (20 CFR 404.1527(e) and 416.927(e)).

These opinions are given little weight. First, they are not stated in terms of specific functional limitations. In addition, these opinions are inconsistent with the medical records discussed above. As noted above, objective imaging and electrodiagnostic testing revealed only mild abnormalities (Exhibit 8F). Likewise, the claimant's treatment records indicate significant improvement with physical therapy (Exhibit 26F/43, 46). In addition, in an appointment on June 28, 2016, the claimant reported that she was feeling much better (Exhibit 26F/89). Nonetheless, the record indicates that the claimant is still recovering from knee surgery and is awaiting carpal tunnel release surgery (Exhibit 29F, 30F). As such, the undersigned finds significant functional limitations consistent with light exertion. In addition, the undersigned has further reduced the claimant's functional capacity in terms of walking and standing.

(Tr. 34-35).

The Court finds the ALJ properly considered the conclusions of Drs. Neugebauer and Hendrickson. Both of these statements were findings Elmer was "unable to work," and offered no specific[12] functional limitations. Thus, these conclusions are not opinions of a medical condition entitled to controlling weight. *See* 20 C.F.R. § § 404.1527(d)(3); 416.927(d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."); *see also Amir v. Comm'r of Soc. Sec.*, 705 F. App'x 443, 448 (6th Cir. 2017) ( "[A] determination concerning whether a claimant is able to work is not a medical opinion . . ."); *Andres v. Comm'r of Soc. Sec.*,

---

[12]     While Plaintiff suggests Dr. Hendrickson's opinion was Elmer had no "use of her hands," this is not an accurate reading of the opinion. (Doc. No. 13 at 10.) Indeed, Dr. Hendrickson opined Elmer was unable to work due to her carpal tunnel syndrome. (Tr. 1300.) He did not specify the degree to which Elmer was limited by her carpal tunnel syndrome, i.e. frequent or occasional manipulative limitations, nor did he find she was completely precluded from using her hands.

733 Fed. App'x 241, 244 (6th Cir. Apr. 30, 2018). Rather, they were opinions on an issue reserved for the Commissioner and entitled to no special significance or deference. *See Turner v. Comm'r of Soc. Sec.,* 381 Fed. App'x 488, 493 (6th Cir. June 7, 2010), *Bass v. McMahon,* 499 F.3d 506, 511 (6th Cir. 2008) ("[C]ontrolling weight will not be provided to a treating physician's opinion on an issue reserved to the Commissioner.").

However, as noted by Plaintiff, a treating physician's opinion on an issue reserved for the Commissioner cannot be ignored. (*See* Doc. No. 13 at 10.) Rather, the ALJ still must "explain the consideration given to the treating source's opinion." *SSR 96-5p*[13] (S.S.A.), 1996 WL 374183, *6 (July 2, 1996); *Bass,* 499 F.3d at 511. Here, the ALJ acknowledged the existence of Drs. Neugebauer and Hendrickson's conclusions Elmer was unable to work. (Tr. 34-35.) The ALJ rejected these conclusions on the basis they were (1) reaching a conclusion reserved for the Commissioner; (2) not stated in terms of specific functional limitations; and (3) inconsistent with the treatment records and diagnostic testing. (*Id.*) The ALJ then cited, with specificity, the treatment notes and diagnostic testing he considered to be inconsistent with the conclusion Elmer was unable to work. (Tr. 35.) After this thoughtful discussion, the ALJ recognized Elmer did have some restrictions due to her recent knee surgery and carpal tunnel syndrome and accounted for them in the RFC. (*Id.*) This is an adequate explanation for the ALJ's rejection of Drs. Neugebauer and Hendrickson's conclusions. The ALJ was not required to defer to the doctors' statements regarding Elmer's disability. *See Morr v. Colvin,* 2015 WL 350384, *5 (N.D. Ohio

---

[13]     SSR 96-5p has been rescinded. This recision is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1 (March 27, 2017). However, Elmer filed her claim in April 2015. (Tr. 268.)

Jan. 26, 2015)("To give controlling weight to a physician's statements that a claimant is disabled or unable to work . . . 'would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'")(quoting SSR 95-6p) *affirmed by Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210 (Mem), 211-212 (6th Cir. Oct. 9, 2015).

Furthermore, the ALJ's rejection of the doctors' opinions is supported by substantial evidence. Despite Dr. Hendrickson's conclusion that Elmer was "unable to work" due to carpal tunnel syndrome, the findings surrounding this impairment have been mild. A July 2015 EMG confirmed bilateral carpal tunnel syndrome, which Dr. Hendrickson interpreted as mild. (Tr. 829, 1518.) On examination, Dr. Hendrickson found Elmer to have slight weakness and "very slight right median intrinsic atrophy," and Tinel's signs on both sides. (*Id*.) She had good intrinsic and extrinsic muscle and tendon function. (*Id.*) During a functional capacity evaluation, Elmer was found to be capable of working "within the LIGHT Physical Demand Capacity," with occasional lifting of 15 pounds, occasionally carrying of 20 pounds, frequent walking, constant reaching, constant above shoulder reaching, frequent fine motor coordination, occasional gross motor coordination, occasional pinching, avoid firm grasping, frequent bending and squatting, and no sustained squatting and kneeling. (Tr. 1372-1373.) The ALJ appropriately reflected some of these findings in the RFC by limiting Elmer to "frequent handling and fingering bilaterally." (Tr. 31.)

Elmer also underwent two left knee operations, in 2014 and 2016. (Tr. 571, 1583.) However, as noted by the ALJ, Elmer displayed improvement in gait and strength during the time between the two operations. After a July 2013 course of aquatic therapy, Elmer attained all her strength goals with improved gait quality. (Tr. 417, 422.) In November 2013, she had a full

range of motion in her left knee, with no swelling or tenderness.  (Tr. 431.)  After the July 2014

operation, Elmer underwent additional physical therapy and reported she was "doing well" and

no longer needed a crutch to ambulate.  (Tr.468.)  In December 2014, Elmer's gait was normal

and her x-rays indicated mild knee osteoarthritis.  (Tr. 692.)

While Elmer continue to report constant pain in her left knee, her physical therapists

noted full strength in her hips and knees.  (Tr. 504, 493, 494.)  In March 2015, she had a full

range of motion and strength in her knee, and no appreciable antalgia in her gait.  (Tr. 495, 496.)

Elmer continued to report left knee pain in 2015 and 2016 and injections provided no relief.  (Tr.

1027.)  She had an antalgic gait during physical therapy in September 2015, but again displayed

improvement in her range of motion and strength.  (Tr. 885, 886.)

Elmer developed left shoulder pain in late 2014 and 2015, but this resolved within a few

months with physical therapy.  (Tr. 474, 508, 499.)  Elmer reported back pain in 2015, but her

lumbar MRI indicated only mild degenerative changes, without any significant stenosis.  (Tr.

826.)  By February 2016, her back pain had improved with therapy, though she continued to

struggle with knee pain, and eventually required an additional operation in September 2016.  (Tr.

1129, 1204, 1583.)  While it is clear Elmer had significant problems due to her knee, the ALJ

acknowledged this and drastically limited her ability to stand and walk.  (Tr. 31, 35.)

Plaintiff directs this Court's attention to several parts of the record which she believes

supports Drs. Neugebauer and Hendrickson's conclusion Elmer was unable to work.  (Doc. No.

13 at 11-13.)  While Plaintiff cites evidence from the record she believes supports a finding of

disability, the findings of the ALJ "are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762,

772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). In this matter, the ALJ clearly articulated her reasons for discounting the conclusions of Drs. Neugebauer and Hendrickson and those reasons are supported by substantial evidence.

Plaintiff also argues the ALJ erred by "failing to recognize the supportability and consistency of the treating physicians' opinions with the evidence of record." (Doc. No. 13 at 13.) It is true a medical opinion must receive controlling weight if it is (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the administrative record. *Gayheart*, 710 F.3d at 376. However, this level of deference is reserved for *medical opinions*. As discussed *supra*, the doctors' conclusions Elmer is unable to work are not medical opinions entitled to controlling weight. *See* 20 CFR §404.1527(d).

Plaintiff further argues the ALJ erred "by failing to continue with an evaluation of the treating physicians' opinions through the factors[14] set forth" in 20 CFR §404.1527(c)(1)-(6).

---

[14]    Plaintiff asserts the consideration of these factors was crucial because all of Elmer's treatment providers "worked in conjunction to treat her multiple impairments." (Doc. No. 13 at 13.) She argues when the treatment records are "viewed in total, the factors under the regulations confirm that the opinions of Plaintiff's treating physicians' deserve great weight." (*Id.* at 14.) However, Plaintiff does not explain why the fact Elmer's treatment providers were coordinating care supports the conclusion Elmer was "unable to work." Moreover, the functional capacity evaluation, which was ordered by Dr. Neugebauer, concluded Elmer was able to perform at the light physical demand capacity, with occasional lifting of 15 pounds and occasionally carrying of 20 pounds. (Tr. 1212, 1372-1373.) This functional capacity evaluation does not

33

(Doc. No. 13 at 13.)  The Court disagrees.  The ALJ specifically noted the treating source status

Drs. Neugebauer and Hendrickson, the lack of explanation and detail provided with their

conclusions, and the consistency of their opinions with the treatment notes, three of the factors

listed at 20 CFR §404.1527.  (*See* Tr. 34-35.)  While the ALJ is charged with considering the

factors set forth at 20 CFR §404.1527 when evaluating medical opinion evidence, the ALJ is not

required to articulate specific findings as to each of these factors.  Indeed, neither the regulations

or Sixth Circuit case law requires an "exhaustive factor-by-factor analysis."  *Francis v. Comm'r*

*of Soc. Sec.,* 414 Fed. App'x 802, 804 (6th Cir. Mar. 16, 2011).  Furthermore, these factors apply

to an ALJ's evaluation of medical opinions.  The Court again notes the conclusions Elmer was

unable to work were not medical opinions under the regulations.  *See* 20 CFR §404.1527(d).

In sum, an ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled.  *See King*, 742 F.2d at 973; *Duncan*, 801 F.2d at 855; *Garner*, 745 F.2d at

391.  *See also* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are

'disabled' or 'unable to work' does not mean that we will determine that you are disabled.")

Rather, it is the Commissioner (and not a treating physician) who must make the final decision

on the ultimate issue of disability.  *See Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435.  Thus,

the ALJ did not err in rejecting Drs. Neugebauer and Hendrickson's broad conclusions Elmer

was "unable to work."

Accordingly, Plaintiff's assignment of error is without merit and does not provide a basis

for remand.

---

support the conclusions of Drs. Neugebauer and Hendrickson, and provides
further support for the ALJ's decision to reject their opinions.

## VIII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED.**


                                                     _s/Jonathan D. Greenberg_
                                                     Jonathan D. Greenberg
                                                     United States Magistrate Judge

Date: January 29, 2019